IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2013

**DEREK LEE WHITE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-373     Steve Dozier, Judge**

_____

**No. M2012-02377-CCA-R3-PC - Filed August 21, 2013**

_____

The Petitioner, Derek Lee White, pled guilty to second degree murder, attempted first degree murder, and two counts of especially aggravated robbery, with an agreed effective sentence of thirty years in the Tennessee Department of Correction. The Petitioner timely filed a petition seeking post-conviction relief, claiming that he had received the ineffective assistance of counsel. The post-conviction court denied the petition after a hearing. On appeal, the Petitioner claims that his attorney failed to: (1) meet with him; (2) fully utilize exculpatory evidence; and (3) hire a private investigator to assist in the defense. After a thorough review of the record, the briefs, and relevant authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Elaine Heard, Nashville, Tennessee, for the Appellant, Derek Lee White.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the shooting of two men, which occurred during a drug transaction. In relation to these shootings, a Davidson County jury indicted the Petitioner for first degree premeditated murder, felony murder, attempted first degree premeditated murder,

and two counts of especially aggravated robbery. After discussion with the State, the Petitioner agreed to plead guilty to second degree murder with a thirty-year sentence, attempted first degree murder with a fifteen year sentence, two counts of especially aggravated robbery with fifteen year sentences, and the State would dismiss the remaining indictment. The sentences were to all run concurrently, for a total effective sentence of thirty years in the Tennessee Department of Correction.

At the guilty plea submission hearing the Petitioner, stipulated to the facts as recited by the State. Before the recitation of the facts, the Petitioner testified that he had discussed his case with his attorney ("Counsel") and was satisfied with Counsel's performance. He confirmed that there was no further investigation of issues or witnesses needed. In addition, he said his plea was voluntary, and he had not been induced to enter a guilty plea by any promise or threat of force.

The State then provided the following recitation of facts in support of the Petitioner's plea:

[The] State's proof would have shown that on November 11th, 2009 [the Petitioner] and Michael S[c]hamberg had communicated on the telephone and agreed to meet up. They knew each other from a college class where they had become friends and Michael S[c]hamberg had on a number of occasions sold marijuana to [the Petitioner].

In the past, sometimes Mr. S[c]hamberg would provide the marijuana to [the Petitioner] and he would allow for [the Petitioner] to give him the money back when he could repay him. That had happened at one point in the past and [the Petitioner] owed a couple of hundred dollars to Michael S[c]hamberg. When Michael S[c]hamberg received the phone call, [the Petitioner] told him that he had the money to repay him and additionally, [the Petitioner] wanted to purchase two more ounces of marijuana. The ounces of marijuana were to be for $400 each, so a total of $1,000 was to be brought by [the Petitioner] when he met Michael S[c]hamberg.

After a number of phone calls between the two, they agreed to meet up at the Quick Sac store in Antioch on Sleepy Hallow [sic]. And prior to going over to that location, Michael S[c]hamberg went and picked up Ryan Wright. Mr. Wright and Mr. S[c]hamberg rode over to that location in Mr. S[c]hamberg's Tahoe and meanwhile, [the Petitioner] had arrived at the location in a dark-colored Impala with his brother Brandon White with him and an additional person who has never been identified.

-2-

[The Petitioner] got into the front seat of Mr. S[c]hamberg's Tahoe. Mr. Brandon White got into the rear drivers' side. Ryan W[right] had gone from the front seat and was sitting in the backseat. All four of them drove away from the location and at first [the Petitioner] was trying to get Michael S[c]hamberg to drive down a road that was sparsely populated. Mr. S[c]hamberg declined to do that and was driving around the neighborhood in the area.

And at [that] point in time, Mr. S[c]hamberg showed [the Petitioner] a small bag of marijuana, he had the larger amount of marijuana in his - - underneath the cup holders in the console of his Tahoe. At that time, [the Petitioner] agreed that he would purchase that marijuana and handed a stack of money to Michael S[c]hamberg. Mr. S[c]hamberg could feel from the weight or the size of the stack of money that it was not the amount of money that it should have been, and he handed it back to Ryan Wright in the backseat asking Ryan to count the money.

They were still driving through the neighborhood at this point in time and the next time Mr. S[c]hamberg looked back, he saw Brandon White holding a gun to Ryan W[right]. He saw Brandon White hit Ryan Wright very hard on the side of his head. He was hit so hard that it immediately began bleeding. And at that point in time, Michael S[c]hamberg pulled the car over and started getting out of the car. [The Petitioner] got out of the front seat and came around to the driver's side. Brandon White got out of the car and pulled Ryan Wright across the backseat at this point in time.

Brandon White was going through Ryan Wright's pockets. At that point in time, Ryan W[right] had a handgun carry permit and did have his handgun in his pocket. Mr. S[c]hamberg also had a gun with him in the side of the seat. At the time, he looked back and saw Brandon White holding the gun to Ryan Wright, he turned around and saw [the Petitioner] grab his gun. So at this point in time, [the Petitioner] put away his own gun, had Michael S[c]hamberg's gun and Brandon White had taken Ryan Wright's gun away from him.

All four parties were standing outside of the doors of the Tahoe and [the Petitioner] and Brandon White each had guns pointed at Mr. S[c]hamberg and at Ryan Wright. There were a number of items taken in addition to the gun taken from Ryan Wright, the money that he had been counting for Michael S[c]hamberg was taken. At some point in time, the additional two ounces of

marijuana were taken from the car. [The Petitioner] also forced Mr. S[c]hamberg to empty out [ ] his pockets and got an additional couple of hundred dollars repeatedly telling him not to do anything stupid. And [the Petitioner] then told Mr. S[c]hamberg to take his pants off. And at that point in time, Mr. S[c]hamberg began to comply with that demand. And the next thing he knew, he heard gunshots. He felt himself get hit with a bullet, and the next shot he heard he saw Ryan Wright drop in the street.

Larissa and Gene Spears were neighbors that lived on Ritchen (phonetic), and as soon as they heard the gunshots, they both went after - - well Ms. Spears went outside and went immediately over to Ryan Wright. At that point in time, she tried to render some aid to him and it was - - he was not conscious at that point in time, but was breathing shallowly. She called 911 for him.

When Mr. Spears came out, he went over and spoke with Michael S[c]hamberg and Michael S[c]hamberg told him - - said the [Petitioner's] name [ ], he said [the Petitioner] shot me. At that point in time, Mr. S[c]hamberg didn't know which of the two fired the gun, he didn't see the gun be fired, but he was announcing the name of the person he knew. Before that day, he had never met Brandon White.

As other neighbors began coming out of the neighborhood - - right after the shots were fired, both [the Petitioner] and Brandon White ran and got into the dark-colored Impala that had dropped them off at the Quick Sac. That Impala went down - - took a left-hand turn and went down the street, ended up being a dead end street so it quickly turned around. Was observed [b]y Mr. Tom Phillips who lived in that neighborhood. The car then quickly sped away from that location.

. . . .

The ambulance and the fire department and police arrived at that point in time. They took Ryan Wright to Vanderbilt Hospital. A number of police officers talked to Michael S[c]hamberg, and everyone that Mr. S[c]hamberg spoke to that day, [he] told that [the Petitioner] was involved in what had happened.

Mr. S[c]hamberg also then went immediately to the hospital where he had emergency surgery performed on him. He suffered a severed intestine.

-4-

They had to remove a portion of his intestines and [he] was in the hospital for a number of days. Ryan Wright was pronounced dead upon his arrival at the hospital. He had been shot one time, it went through his body and the bullet was lodged in his spine. It was recovered by the medical examiner.

Police at the scene conducted the investigation, they recovered three shell casings that were consistent with the caliber of bullets that were removed from Mr. Wright and Mr. S[c]hamberg. It was a .45 caliber gun. They also collected a number of items of other evidence at the scene, one of them being a pair of what appeared to be headphones for like a shooting rang[e], ear protection piece. They processed that and a number of other items and when that ear piece was processed, a fingerprints belonging to Brandon White was identified on that. When police arrived at the scene, that ear piece was just under the side of the left-hand side of the Tahoe where all of this took place.

The Petitioner entered a plea of guilty, and the trial court sentenced the Petitioner to serve an effective thirty-year sentence in the Tennessee Department of Correction.

## B. Post-Conviction

The Petitioner timely filed a post-conviction petition claiming that he had received ineffective assistance of counsel related to his guilty pleas. At the hearing on the petition, the parties presented the following evidence: The Petitioner testified that his attorney ("Counsel") was appointed to represent him in criminal court on these charges. He said that, during Counsel's two-year representation of the Petitioner, Counsel came to the Criminal Justice Center twice to meet with him and that the two also met twice while he was in the custody of the Tennessee Department of Correction ("TDOC") to "sign for my time." The Petitioner said that Counsel brought discovery materials during one or more of these visits and reviewed it with him.

The Petitioner testified that, shortly after his arrest, his mother provided Counsel with a recorded confession from his "charge partner," the Petitioner's brother. The Petitioner did not know whether Counsel ever showed the confession to the State. The Petitioner also requested that Counsel hire an investigator to follow the victim, Michael Schamberg. He alleged that Schamberg continued to illegally sell drugs. He believed that this information could be used to attack Schamberg's credibility as the State's witness at trial. The Petitioner agreed that Schamberg testified at the preliminary hearing and bond hearing that the shooting occurred during a "marijuana deal." The Petitioner maintained that Schamberg's involvement in selling illegal drugs since the shooting would discredit Schamberg's testimony.

-5-

The Petitioner testified that Counsel never discussed a motion to suppress or any type of trial strategy with him. He said that Counsel told him that he potentially faced two life sentences plus seventy-five years. Counsel advised him that the trial court judge was "known for giving [ ] the max amount of time and stacking [the] sentences." The Petitioner explained that the source of the two life sentences, to which Counsel referred, were the charges for the felony murder of Ryan Wright and the first degree murder of Ryan Wright. The Petitioner said that Counsel never explained that the State would have to elect between the offenses against the same victim and only told him that he would face two life sentences based on the charges.

The Petitioner testified that he asked Counsel about the possibility of pleading guilty to facilitation, and Counsel told the Petitioner that the State was not willing to offer a plea agreement for anything other than murder. The Petitioner said that he pled guilty because he "felt like [his] back was against the wall." He did not have confidence in Counsel's representation or preparation for a trial. He stated that, through his petition, he sought to renegotiate his sentence, but the had no intention of going to trial. He further stated that he had never wanted a trial on these charges.

The Petitioner recounted the events leading up to the shooting. He explained that where the parties met was a busy location, so Schamberg drove into a nearby neighborhood. The Petitioner said he was seated in the front seat when Wright and his brother "got into a tussle" in the back seat of the car. Schamberg parked his truck "to see what was going on." The Petitioner said he saw Wright holding a gun and his brother holding Wright's hand down. He said that his brother took the gun from Wright and got out of the car. Schamberg also had a gun, and, ultimately, his brother shot Schamberg.

The Petitioner denied taking any items from the car and denied any knowledge of what happened to Schamberg's gun after the shooting. The Petitioner explained that after his brother shot Schamberg and Wright, they did not have time to stop and take items. They immediately fled the scene. The Petitioner agreed that he "had people following" them and it was in this car that he and his brother fled following the shooting. He maintained that he and his brother did not take money, drugs or a gun following the shooting.

The Petitioner testified that he had also asked Counsel to speak with neighbors who witnessed the shooters fleeing in a blue Malibu. He stated that, because the car was a black Impala and not a blue Malibu, the witnesses identification could be questioned.

The Petitioner testified that he consistently told Counsel that he did not want to go to trial but "wanted to work something out." The Petitioner agreed that, in addition to Counsel's meetings in jail, he also met with Counsel at court appearances. The Petitioner

said that his fiancé called Counsel on the Petitioner's behalf, and Counsel would not return her phone calls for "maybe three or four weeks."

The Petitioner testified that he did not clearly understand the implications of his waiver of the right to appeal when he entered the guilty plea. He agreed that the trial court instructed him of this waiver but maintained that he did not understand. He explained that, during the guilty plea submission hearing, he was "just trying to make things go as smooth as possible." He recalled that, before entering the court room for the guilty plea submission hearing, he asked Counsel what would happen if he requested a new attorney. Counsel told him that "it probably wouldn't go." Counsel said that the State might even "take the deal off the table . . . [b]ecause they will think you're playing with them." Based upon this interaction, the Petitioner felt he should "say everything [Counsel] want[ed] [him] to say."

The Petitioner testified that when the trial court asked him if he was satisfied with his attorney's representation, he turned to Counsel and asked if his response would affect his post-conviction "in any kind of way." Counsel responded, "no." The Petitioner stated that this exchange could be heard on the recording of the guilty plea submission hearing.

Counsel testified that, at the time he was appointed to represent the Petitioner, he had practiced law for three years and had not taken a case to trial. He said that this was his first case representing a defendant charged with murder, but he had represented individuals charged with different levels and types of crimes.

Counsel testified that, during his representation, he kept in "regular communication" with the Petitioner's fiancé and mother by telephone. He met with the Petitioner both in court and jail visits. Counsel recalled meeting with the Petitioner twice before the Petitioner was transferred to TDOC and twice while the Petitioner was incarcerated in a TDOC facility. Counsel said he met with the Petitioner "numerous times" at the courthouse but acknowledged that there were several times where the Petitioner was taken "down stairs" before Counsel had an opportunity to meet with him.

Counsel testified that he received discovery in this case and reviewed it with the Petitioner. Counsel said that he also reviewed with the Petitioner the charges against him and possible penalties. Counsel stated that he explained the possible penalty for both the first degree murder of Ryan Wright and the felony murder of Ryan Wright, but his "position" was that the convictions would merge if the Petitioner were convicted of both offenses at a trial.

Counsel testified that, although the Petitioner was "adamant" he did not want a trial in these matters, he discussed trial strategy with the Petitioner. Counsel stated it was a "tough case" against the Petitioner, and he believed the trial would come down to

Schamberg's credibility as a witness, who pulled a gun first, and whether a robbery occurred. Counsel explained that, even with the Petitioner's brother's admission, the case against the Petitioner under the theory of criminal responsibility was strong. Counsel said that he explained the theory of criminal responsibility and its application in this case. He said that he believed the Petitioner understood, and he described their communication as "good."

Counsel testified that he did not seek an investigator for trial preparation in this case. He explained that the State's discovery included information regarding Schamberg's criminal activity. He said that because Schamberg freely admitted his involvement with criminal activity, he did not believe there was reason to justify hiring an investigator for this issue. Counsel said that he reviewed witness statements to police and that no one actually saw the individuals get into a car but that one person saw a "blue or black, police looking vehicle" leaving near the scene.

Counsel testified that the Petitioner's mother provided him with the Petitioner's brother's recorded confession. Counsel said that he did not provide this recording to the State because the State was already aware of the admission. Counsel could not recall whether the Petitioner asked him to give it to the State but said that the Petitioner wanted Counsel "to be aware" of the statement.

Counsel testified that the Petitioner appeared to fully understand the plea petition when he reviewed it with the Petitioner. He recalled that the Petitioner asked questions and seemed to understand Counsel's responses to the questions. Counsel said that the Petitioner never indicated he did not want to go forward with the plea agreement and never said anything that led him to believe that the Petitioner did not understand the implications of entering the plea agreement.

Counsel testified that the Petitioner was to be tried jointly with his brother. The Petitioner's brother was represented by an attorney with at least thirty years of experience. Counsel said that he and this attorney engaged in "some pretty lengthy and full discussions" about the case, various strategies, and the trial.

Based on this evidence, the post-conviction court denied the Petitioner post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of counsel. Specifically, he asserts that Counsel failed to: (1) meet with him; (2) fully utilize exculpatory evidence; and (3) hire a private investigator to assist in the defense. The State

-8-

responds that the Petitioner has failed to prove his allegations by clear and convincing evidence and that, therefore, the post-conviction court should be affirmed. We agree with the State.

After the hearing, the post-conviction court issued a written order denying relief. It reasoned as follows:

> The [Petitioner] acknowledged that [Counsel] discussed criminal responsibility with him. He met with the [P]etitioner four (4) times while he was incarcerated and multiple times at pretrial hearings. The Court accredits the testimony of his attorney that he explained the consequences of the plea in detail. The [P]etitioner stated in the plea hearing that he was satisfied with his attorney, and there was no issue with his attorney's representation. Further, nowhere in the plea colloquy does the [P]etitioner say anything to his attorney or the Court about post-conviction relief. The [P]etitioner has failed to prove this allegation by clear and convincing evidence and has not shown prejudice from the allegation, therefore the [P]etitioner is not entitled to relief on this issue.
>
> . . . .
>
> The testimony of the [P]etitioner as well as of [C]ounsel was that the [P]etitioner stated unequivocally that he never wanted a trial. The [P]etitioner also acknowledged that [C]ounsel fully explained the charges and consequences of the plea. The Court accredits the testimony of [Counsel] that he correctly explained the possible sentences if the [P]etitioner was convicted at trial. The [P]etitioner has failed to prove this allegation by clear and convincing evidence and has not shown prejudice from the allegation.
>
> . . . .
>
> [T]he testimony of both the [P]etitioner and counsel was that counsel met with the [P]etitioner on multiple occasions in jail as well as in court prior to trial and explained the charges and the possible consequences in detail. The Court accredits the testimony of [Counsel] that he and co-defendant's counsel, [ ], met with both defendants and discussed the case and the risks and benefits of trial.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations

in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753

S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (footnote omitted); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

The evidence does not preponderate against the post-conviction court's findings. The Petitioner first alleges that Counsel failed to meet with him. The record shows that Counsel met with the Petitioner four times at his place of incarceration and multiple times during court appearances. During these meetings, Counsel reviewed the discovery with Petitioner and discussed weaknesses in the case. He also discussed the Petitioner's charges and the possible penalties. Counsel also met with the Petitioner, his co-defendant and co-defendant's counsel to discuss possible strategies. The Petitioner has failed to show by clear and convincing evidence that Counsel did not adequately meet with the Petitioner to discuss the case or that he was prejudiced by a lack of consultation between him and Counsel.

-11-

The Petitioner next asserts that Counsel failed to adequately use the Petitioner's co-defendant's recorded admission. He fails, however, to state what Counsel should have done with the recording and how that would have benefitted the Petitioner. Counsel acknowledged his receipt of the recording and stated that he did not provide the State with the recording. He explained that he did not do so because the State was aware of the co-defendant's admissions, thus, a recording of the admission was unnecessary. Counsel stated that, even with the admission, the Petitioner could still be convicted under the theory of criminal responsibility. The post-conviction court credited Counsel's testimony that he thoroughly reviewed and explained criminal responsibility and its implications in this case. We conclude that the Petitioner has failed to show by clear and convincing evidence that Counsel's performance was deficient or that he was prejudiced by Counsel's failure to provide the State with his co-defendant's recorded admission.

Finally, the Petitioner contends that Counsel was ineffective for failing to hire an investigator in this case. Counsel testified that he elected not to hire an investigator to investigate Schamberg's criminal activity because Counsel learned through discovery that Schamberg had openly acknowledged his involvement in illegal drug transactions. For this reason, Counsel did not believe an investigator would add anything to the fact that Schamberg was still engaged in criminal activity since the shooting. Counsel reviewed statements from witnesses who were at the scene, and one witness indicated seeing a blue or black vehicle, similar to a police vehicle, leaving the area after the shooting. Based upon this information, Counsel found no need to employ an investigator to assist him in his representation of the Petitioner. The Petitioner has failed to show by clear and convincing evidence that Counsel's failure to employ an investigator was deficient representation or prejudiced the Petitioner.

Accordingly, we conclude that the Petitioner has not shown by clear and convincing evidence that Counsel was ineffective in his representation or that the Petitioner was prejudiced by Counsel's representation. Therefore, the post-conviction court properly denied the Petitioner relief.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE